SIMONTON, Circuit Judge
(after stating the case as above). The question in this case is: Is the contract set forth in the bill as the sole cause of action such a contract as a court of equity will enforce? There were two competitors before the municipal authorities of Richmond, each seeldng for himself, upon the best terms he could, the grant of a street-railway franchise. Apparently both of them were promoters,—that is to say, were without sufficient capital themselves, depending upon securing the aid, co-operation, or purchase of capitalists. The competition evidently was bitter and hostile, for *843 the competitors had no communication whatever with each other. The complainant was satisfied that he had “the inside track,” and was “master of the situation.” With this high hope and encouragement, he sought his capitalist in New York, to obtain the fruition of his efforts. There he unexpectedly meets his rival in close conference with the capitalist. Under the advice of this capitalist, he lays aside his rivalry, and the competitors become allies, and all competition between them ceases. The reasons which induced him were that the antagonism would probably result in the defeat of both, or that, before the franchise was obtained, it would be loaded with such onerous and exacting conditions that no capitalist could be induced to put money in the enterprise. The result of the advice was the contract in question. By this contract complainant and his rival joined hands, withdrew all competition, agreed to co-operate in securing a franchise for a street railway from the municipal authorities of Richmond, and to divide whatever was realized from the enterprise, first deducting expenses incurred by either side. They agreed to use, so far as it went, the advantage of complainant’s deposit in a Richmond bank, and the franchise to be asked for was that of the Richmond Traction Company for the building of an overhead trolley railway or cable system. Adding these words: “Among ourselves, we will decide what names are proper to be used in the franchise, and the policy we will use in procuring the same.” The effect of this reconciliation of interests was to prevent all competition between the rival promoters; to shut off, as far as they could, all possible competition from others, which might result in the defeat of both; and to avoid the imposition of conditions by the municipal authorities, which the promoters, and especially capitalists, might consider onerous and exacting. The circuit court which tried the case was of the opinion that the contract was against public policy.
A text writer (Greenhood) states the rule to be this:
“Any agreement which, in its object or nature, is calculated to dimmish competition for the obtainment of a public or quasi public contract to the detriment of the public or those awarding the contract is void.” Greenh. Pub. Pol. p. 178, Rule 172.
In Pingry v. Washburn, 1 Aiken, 264, the court held that an agreement on the part of a corporation to grant to individuals certain privileges in consideration that they will withdraw their opposition to the passage of a legislative act touching the interests of the corporation is void as against public policy, and. prejudicial to correct ;and just legislation.
In Hunter v. Nolf, 71 Pa. St. 282, a contract between two candidates for the office of United States assessor that one should withdraw, and, if the other were appointed, they should divide profits, was recognized and treated as against public policy, and void. To the same effect is Meguire v. Corwine, 101 U. S. 108.
In Smith v. Applegate, 23 N. J. Law, 352, a note given to a person in consideration that he withdrew all opposition to the opening of a road was held void for the same reason.
The supreme court of Massachusetts in Gibbs v. Smith, 115 Mass. 592, clearly marks the line in an analogous case:
*844 “An agreement between two or more persons that one shall bid for all upon property about to be sold at public auction, which they desire to purchase together, either because they intend to hold it together or afterwards to divide it into such parts as they individually wish to hold, neither desiring the whole, or for any similar honest or reasonable purpose, is legal in its character, and will be enforced. But such an agreement, if made for the purpose of preventing competition, and reducing the price of the property to be sold below its fair-price, is against public policy, and void.”
A citation and examination of the very many cases on this fruitful subject would run this opinion, already too long, into an unreasonable length. Any effort which stifles competition, or prevents a fair and reasonable price for property, is against public policy. Especially is this the case when the property is a public or quasi public franchise. In the case at bar there were two bidders before the municipal authorities of Richmond for the franchise of a street rail-w-ay. Naturally and normally that competitor would receive the franchise who made the greatest concession for the public welfare.. The competition was active. Its tendency was to promote the public interest. It was withdrawn by the coming together of the parties, who agreed to abandon it for fear that they would neutralize-each other, and also for fear that the passage of the franchise in favor of one of the two competitors would be loaded with such onerous and exacting conditions that no capitalist could be induced to put his money in it. In other words, the competition would induce-great and extraordinary concessions for the public good. To prevent this, it was abandoned. Among themselves they would decide what names to be used in procuring the franchise, and the policy to be used in procuring it; that is to say, there being but one-contractor in the field, the promoters themselves could, in the absence of competition, decide to whom the contract should be awarded, and could, in some measure, dictate the terms and concessions to-be used in procuring the franchise. “The true inquiry is, is it the natural tendency of such an agreement to injuriously influence the public interests? The rule is that agreements which, in their necessary operation upon the action of the parties to them, tend to restrain their natural rivalry and competition, and thus to result in the disadvantage of the public or third parties, are against the principles of sound public policy, and are void.” Atchesom v. Mallon, 48 N. Y. 147. The conclusion is not unreasonable that the contract was against public policy and void.
But it is contended that, if this be admitted, the complainant is-still protected by the doctrine laid down in Brooks v. Martin, 2 Wall. 80, recognized in Farley v. Hill, 150 U. S. 576, 14 Sup. Ct. 186, and in the dissenting opinion in Burck v. Taylor, 152 U. S. 668, 14 Sup. Ct. 696; Armstrong v. Bank, 133 U. S. 467, 10 Sup. Ct. 450. The principle decided in these cases is:
“When several persons enter into an illegal contract for their own benefit, and the illegal transaction has been consummated, and the proceeds of the enterprise have been actually received, and carried to the credit of one of such parties, so that he can maintain an action therefor without requiring the aid of the illegal transaction to establish his case, he may be entitled to relief.”' McCrary, J., in Cook v. Sherman, 20 Fed. 170.
See, also, Jackson v. McLean, 36 Fed. 217.
*845 This construction by Judge McCrary is sustained upon examining the case of McBlair v. Gibbes, 17 How. 233, which is the leading case on which this principle depends. In that case, and in all the quotations cited to support it, the cause of action was not the illegal transaction,—the void act,—but a subsequent independent contract which the law raised. The difference is between enforcing illegal contracts and asserting title to money derived from them. Tenant v. Elliott, 1 Bos. & P. 3; Farmer v. Russell, Id. 296; Thomson v. Thomson, 7 Ves. 473,—all cited and approved in McBlair v. Gibbes, supra. Sir William Grant, in the case in 7 Ves. 473, clearly states the principle. In that case there had been a sale of the command of an East India ship to the defendant. This was an illegal transaction. In consideration of the sale, he had agreed to pay an annuity of £200 to the previous commander, from whom he purchased, so long as he remained in command. Defendant, after remaining in command for some time, retired, and secured the retiring allowance of £3,540. The bill was filed to get a decree enforcing the contract, and investing so much of this as would produce £200 per annum. The objection was made that the contract providing for the annuity was illegal, and a court of equity would not enforce it. The distinguished master of the rolls held the contract illegal. He recognized the equity in the fund, if it could be reached by a legal agreement, but there was no claim on the money, except through the medium of an illegal agreement, which, according to the determinations, cannot be supported. “How, then,” says he, “are you to get at it except through this agreement? There is nothing collateral, in respect of which, the agreement being out of the question, a collateral demand arises.” In the case at bar the entire cause of action is on the agreement, which is void through public policy. The complainant depends altogether upon that agreement, and seeks to set aside everything that has been done, and to enforce the specific performance of that agreement. He asks the court “to enforce this illegal contract, and requires the aid of the illegal transaction to establish his case.” It follows that the contract under consideration can neither be enforced nor made the basis of any relief in a court of equity. The maxim in pari delicto applies. The court will leave the parties to such a contract precisely where it finds them. “Courts cannot be made the handmaids of iniquity.” Bank v. Owens, 2 Pet. 539.
It is urged, however, that the complainant, on the very afternoon of the day on which the city council gave the franchise, exposed his agreement with Shield in a public print. Assuming that this was seen by the members of the council, it cannot avail him. The wrong complained of is not that he concealed his contract, but that he made the contract; not that he pretended still to seek a franchise, but that he sold himself out, and, doing so, defeated competition, shut the city council in to but one bidder, deprived the public of that contention among bidders which would protect the public from loss, and secure the highest price for the sale of the franchise. This is not a case in which a court of equity should interfere, and the decree of the circuit court should be affirmed, without prejudice, however, to *846 any right which complainant may have to seek relief, if any he be entitled to, in a court of law.
The CIRCUIT JUSTICE concurred in the result, on the ground that the remedy of the complainant, if any, was at law.
In this conclusion, also, SIMOHTOH, Circuit Judge, concurred.